Moses, J.
This action was filed on October 1, 1999, by Sandra Liska and Jan Liska against Travelers Property Casualty Corp. (Travelers) and Norfolk & Dedham Group (Norfolk). Since the filing of this action, the Liskas have divorced and Ms. Liska has resumed her maiden name of Wycoff. The complaint seeks declaratory relief against Travelers and Norfolk and asserts that from April 1994 through April 1996, Norfolk provided a homeowner’s insurance policy to the Liskas in connection with their home at 24 Freeman Street, Harwichport, Massachusetts, hereinafter referred to as “the premises.” The complaint further asserts that Travelers provided homeowner’s insurance to the Liskas for the premises from 1996 through the present. The plaintiffs seek a declaration that they are entitled to coverage for certain losses arising out of a water heater failure occurring in April 1995. The complaint asserts that Norfolk is liable under its policy claiming that the water heater failure was a covered loss together with the consequential losses. They further claim that a certain mycotoxin was produced as a result of the aforesaid flooding and that contamination was not discovered until early 1999 at which time the plaintiffs vacated their premises. They therefore claim that they are entitled to compensation under the Travelers policy for remediation costs and loss of use of the premises.
There are further claims asserted in the complaint against both defendants for violation of G.L.c. 176D and G.L.c. 93A which the plaintiffs dismissed prior to trial. Both Norfolk and Travelers deny that the water heater failure of April 1995 was the cause of the mycotoxins which allegedly caused the plaintiffs’ premises to become uninhabitable and further assert various other defenses to the plaintiffs’ claim, including without limitation, certain exclusions within their respective polices relating to mold.
The within action was tried jury-waived commencing on September 20, 2004, and concluding on September 27, 2004. A view of the premises was conducted on September 20, 2004.
FINDINGS OF FACT
The Liskas purchased the premises at 24 Freeman Street, Harwichport, Massachusetts, in approximately April 1978. The home consists of fourteen rooms constructed in 1813 and is approximately one-quarter mile from the ocean. Additions have been made to the premises over the years including a garage above which there is living space. The main house of the premises, the subject of this litigation, is heated by a forced hot air system with galvanized steel duct work serviced by a low-boy, oil-fired furnace. The furnace is constructed with two separate chambers side by side, the first containing a heat exchanger into which the burner fires. The other side of the furnace contains a blower which takes the air supplied by the return duct work and blows it into the portion of the furnace in which the heat exchanger is situated. This flow of air then continues through supply ducts heating various sections of the house. Also situated in what is described as the living room of the house is a coal burning stove.
The evidence establishes that a substantial portion of the house does not have gutters and hence water draining from the roof drips directly into the ground surrounding the home. There is also an outdoor shower situated to the rear of the home which drains directly into the ground. A furnace and a water tank for the premises are situated in what has been described by the parties as a utility room in the basement which is relatively level and has a concrete floor. A narrow passageway leads from the utility room at a downward slope to a second narrow room toward the center of the house which leads to a third room housing a large water tank. A major portion of the basement is surrounded by a dirt crawl space. Inspection of the basement, including the utility room, reveals that the walls are constructed of cinder block and evidence exists of prior water intrusion, particularly in an area which constitutes the foundation for the fireplace.
The plaintiffs had also installed a humidifier which was directly attached to the heating system in approximately 1996 until it was removed in approximately October of 1998 due to concerns by Ms. Wycoff that she was suffering from an illness known as humidifier fever.
The entire heating system excluding the humidifier had been in place since prior to the purchase of the premises by the plaintiffs and over the years certain sections of the duct work which is galvanized to protect against rust had become corroded and rusted. In particular, a section of duct which supplied air to a heating grate under the kitchen table had become so corroded over the years that one of the party’s inspectors was able to poke his finger through it. Another section of duct on the east wall of a portion of the basement was also extremely corroded. The plaintiffs in responses to requests for admissions of fact admitted that their washing machine located on the main floor of the premises had overflowed on at least two occasions prior to April of 1995 but they deny that the water entered the basement of the property. They further admit that a pipe had burst in the garage of the property prior to April of 1995 but deny that water entered the basement or home. They further admit that in 1996 water leaked through the roof in the area of the living room but assert that water only seeped into the crawl space as a result of the leak. The plaintiffs further admit that prior to 1999 a vent pipe to the second-floor bathroom leaked causing ceiling damage but deny that the water leaked to the first floor *646 or basement. The plaintiffs admit that they never cleaned the heating ducts at the property from the time they purchased their home.
On or about April 2, 1995, Ms. Wycoff, who was occupying the premises at that time with her daughter, discovered that the hot water for the home was not working. She went downstairs to the basement and noted that there was flooding caused by a failure of the hot water tank which was located in the same portion of the basement as the furnace. The water was immediately mopped up with some of it being swept into drains situated in the basement. Ms. Wycoff described the water as being two to three inches, but the court concludes that it is highly unlikely the water reached this level. This conclusion is based in part upon the testimony of a heating contractor who was called by the defendants who testified that he had changed thousands of hot water tanks. Also, one of the defendants’ experts testified that the walkway from the utility room leading to what was described as the tile room slopes downward and hence the water would have flowed downhill away from the utility room. In either event, it is likely that the water tank failure provided sufficient water to cover the floor of the utility room. The furnace was situated on a metal pan with small slits on all corners thereof for the purpose of allowing oil to escape in the event of a failure of the furnace. Such slits would have allowed the entrance of a small amount of water into the base of the furnace at the time of the water tank failure in question.
The plaintiffs promptly replaced the water tank after it leaked. Some items of personal property of the plaintiffs were in boxes in the basement and were damaged by water. Norfolk provided homeowner’s insurance to the plaintiffs which covered the period of April 2, 1994, through April 3, 1996. After the water heater failure, Ms. Wycoff concluded that any claim she submitted would not exceed her deductible under the Norfolk policy and hence she declined to notify Norfolk of a loss or to submit a claim. The water heater was promptly replaced and Ms. Wycoff and her daughter continued to reside in the premises. In November of 1995, she began to complain of low back pain she felt was caused by lifting boxes at her place of employment. She made a workers’ compensation claim and received chiropractic treatment. In 1998 she continued to complain to Dr. Lin about back pain related to her work-related injury. X-rays of her spine taken in 1995 reflected scoliosis. In June of 1998, Ms. Wycoff remained in bed with a high fever and difficulty walking. She had severe back and leg pain, headaches, some confusion, garbled speech, and other symptoms including nausea. She received various diagnoses and received treatment for Lyme disease and rheumatoid arthritis.
In December of 1998 she visited family in Pennsylvania for 14 days and many of her symptoms either lessened or disappeared. Some of her symptoms reoccurred after returning to her home and turning up her heat. After further investigation she concluded that her difficulties were related to her home, and she moved out of the main house with her daughter and began residing in the living space over her garage. With the exception of moving to another location for a brief time in February of 1999, she has continued to reside in the living area over the garage up to the present time and has left the main house totally unoccupied with furnishings and other personal belongings left in place. Also in early 1999, Ms. Wycoff caused certain environmental testing to take place within the home involving the taking of various samples to determine the presence of fungi and myotoxins. Detected within the home, and particularly within the duct work for the heating system, was a myotoxin known as ochratoxin-A which is typically produced by a mold known as Aspergillus ochraceus. The plaintiffs contend that the presence of ochratoxin-A within their home made the premises unhabitable. They further assert that the production of this myotoxin can be causally related to the water tank failure of April 2, 1995.
PLAINTIFFS’ MEDICAL EVIDENCE
The plaintiffs rely heavily on the testimony of Eckardt Johanning, M.D. who is a medical doctor specializing in family medicine and in occupational/environmental medicine. Dr. Johanning has done extensive work with various local, state, federal and international agencies in connection with various environmental issues including indoor air problems relating to fungi and mycotoxins. He has also edited various articles in the area and has been published relating to mold and mycotoxins in homes and work sites. Dr. Johanning was visited by Sandra Liska at his office in New York on April 23, 2001, and claimed to have obtained a comprehensive medical, environmental and occupational history from her. He applied a principal known as “differential diagnosis” which is a process by which the physician learns of the patient’s symptomatology, completes an examination, reviews the facts and all the information available, and develops a differential diagnosis of all possible conditions that could be explained by the symptomatology. The court concludes that this is a reliable methodology in the medical field; however such method of diagnosis is not conclusive and depends in large part upon the accuracy and extent of the medical history and other facts provided to the physician. The history provided to Dr. Johanning by Ms. Wycoff indicated that her clinical picture started somewhere around 1995 and then intensified requiring medical care in 1998 and 1999 when she moved out of the house and her symptoms subsided.
Ms. Wycoff provided Dr. Johanning with a chronology commencing on April 3, 1995, and concluding on April 3, 1999, which chronology began with a description that the newly purchased water tank had been installed within two days of a water tank failure and *647 concluded with an entry of April 3, 1999, providing “Moved to house in Chatham. Health dramatically improved.” He concluded that Ms. Wycoff suffered from allergy-hypersensitiviiy reaction from which she claims is a systemic reaction to intensive exposure to allergenic and toxic type molds. In forming his opinion he considered various testing performed by a Mr. Jeff May which revealed the presence of Aspergillus ochraceus and Penicillium and certain test results from Romer Lab. He concluded that Ms. Wycoff had suffered a reaction to certain molds which is consistent with prolonged mold exposure and which resulted in her hypersensitivity. He based his opinion in large part upon the assumption that her history of symptomatology and medical care started in 1995.
At trial the defendants called William Whitlaw, M.D., who was the plaintiffs’ primary care physician for many years. A transcription of Dr. Whitelaw’s patient notes was introduced into evidence and authenticated by him. Dr. Whitelaw treated the plaintiff from 1982 through April 23, 1995. In July of 1985 the plaintiff complained about fatigue without specific symptoms. In August of 1985 she indicated she was fatigued all the time. In April of 1986 she was tested for allergic responses. In July of 1986 she underwent allergic testing with a notation, “Scratches have turned to contact dermatitis . . . graduated prednisone and observe.”
On September 8, 1986, she underwent further skin testing with a heightened reaction to mixed epidermal. The patient’s notes included the statement, “The reaction mixed epidermal, pyrethrums, etc. associated with horses. Has cat and dog. Uses feather pillows, symptoms worse when opens store.” On September 29, 1986, Ms. Wycoff continued to experience problems with sinusitis and was referred to physical therapy for a pinched nerve in her lower back. On May 1, 1987, she was suffering from allergies which bothered both her ears. On October 5, 1987, she continued to suffer from allergies and graduated prednosone was considered andwas prescribed onNovember 16,1987.
Her sinusitis continued through 1989 and 1990, and on December 19, 1990 she was experiencing joint pain and had a difficulty with her allergies. Her sinusitis continued through 1995.
The court finds that Dr. Johanning was not provided with a complete and adequate medical histoiy for Ms. Wycoff and his opinion that Ms. Wycoffs clinical picture began somewhere around 1995 and intensified is not supported by the evidence. The court concludes, however, that there were mycotoxins present in the Wycoff home for a number of years which included ochrartoxin A and that it is likely that Dr. Johanning’s diagnosis was accurate to the extent that he concluded that Ms. Wycoffs symptoms were consistent with intensive exposure to allergenic and toxic iype molds. Dr. Johanning’s testimony, however, does not establish to any reasonable degree of probabiliiy precisely when such exposure began.
FINDINGS AS TO THE CAUSE OF MYCOTOXINS AT THE WYCOFF PREMISES
Plaintiffs and defendants offered expert testimony relating to the existence and cause of the mold and mycotoxins at the premises. A review of the expert testimony offered by the parties reveals that they are substantially in agreement on many scientific principals relating to the generation of mycotoxins. All the experts had an opportunity to review the laboratory reports prepared in connection with the premises which first began in 1999 with other samples being taken into 2000 and 2001.
The court finds that the evidence presented by the parties confirms that the highest concentrations of ochratoxin A detected in the home were in the duct work with extremely high concentrations being located in the duct work below the two heating grates for the kitchen.
The experts for both sides concur that the likely genus of the ochratoxin A was the mold known as Aspergillus ochraceus and when combined with a sufficient amount of moisture and the proper temperatures would have created the ochratoxin A. The optimum temperature for the production of this mycotoxin is approximately 31 degrees centigrade. Aspergillus ochraceus uses a nutrient en2yme system which ends with a by-product; namely, ochratoxin A.
Aspergillus ochraceus may also contain what are known as colony forming units which can generate spores known as canidia which can create new fungus colonies if they land in locations where there is sufficient intrusion of water and the proper temperatures. In certain circumstances ochratoxin A may start growing within six hours and form new canidia with large amounts of ochratoxin A being generated. As previously indicated, the optimal temperature for generation of Aspergillus ochraceus is 31 degrees centigrade (or 87 degrees Farenheit). At and above 37 degrees centigrade (98.6 degrees Farenheit) ochratoxin A will iypically not be produced. It is also important to understand that Aspergillus is ubiquitous, being typically found outdoors and indoors and often two to three species of the same being found within the home.
While there were extremely high levels of ochratoxin A in the kitchen duct work, the levels of ochratoxin A in the furnace were either at non-detectable levels or at levels below five parts per billion. Typically the source of any contamination of ochratoxin A has the highest levels thereof. The plaintiffs argue that because the furnace is a hot air system with air circulating away from the furnace, the canidia which generated the ochratoxin A would have been carried away from the original source of contamination.
The defendants argue, however, that any spores or canidia which generated the mycotoxins could easily have entered through the grates in the system. The only expert who testified who was thoroughly familiar *648 with the mechanical aspects of the furnace in question was Paul D’Allesandro, a mechanical contractor who has worked with numerous such furnaces. He also holds a master plumber’s license and master sprinkler/fitters license. D’Allesandro testified that any water which found its way into the furnace as a result of the leakage of a hot water tank would drain out through the drain slits at the four corners of the pan on which the furnace is situated and any remaining water would promptly evaporate with the operation of the furnace including any water located under the blower side.
The court finds that the most probable cause of the high levels of ochratoxin A located in the ductwork, and thereafter any subsequent contamination of the home, was a chain or chains of events other than the water heater failure of April 1995. The excessive corrosion of the duct work reveals that there was excessive moisture within the duct system for this home for many years and the condition was clearly exacerbated by the presence of a humidifier in the late 1990s. Also, the location of the floor grates was a source of moisture from the washing of the floor and potential water spills occurring over the years. A substrate was also sufficient within the duct system in the form of floor sweepings including, without limitation, dust particles and pet food (there was evidence that Ms. Wycoff kept her pets in the kitchen in the viciniiy of one of the floor grates). Also, temperatures within the duct system could be within the parameters for the production of ochratoxin A, particularly when the heating system was on and also potentially during warm spells in the summer.
The court further notes that while the air flow of the furnace when in operation travels away from the furnace through the supply ducts, spores can also enter the ducts through the grates and for that matter can be blown into the system from the basement.
Plaintiffs testimony was sketchy as to whether the coal burning stove in her home was the primary source of heat in April of 1995. If in fact the furnace was not needed for heat in April of 1995 after the water heater failure, the temperatures in Wycoffs’ unheated basement would have been relatively low in light of the fact that in early April the temperatures ordinarily ranged from the low 20s (Farenheit) to the low 50s (April 2 through April 12, 1995). On the other hand, if the furnace were the primaiy source of heat, it is highly likely that any water which had found its way into the furnace pan would have promptly evaporated upon activation of the furnace and would not have been a continuous source of moisture sufficient to promote the mold growth in question.
REMEDIATION
There was testimony from experts for the plaintiffs and the defendants as to what remediation would be appropriate in connection with the premises. There was no credible evidence of the existence of mold growth which had caused any substantial structural damage to the premises.[1] The experts concur that various strains of Aspergillus can typically exist in both an indoor and outdoor environment and hence there is never total elimination of the presence of mold spores from the environment. There are cleanup measures available in order to return to a reasonable base line which involve the use of some biocides on a selective basis because they can be toxic. An appropriate measure would be to lower the humidity in the Wycoff basement by the use of a dehumidifier. The use of the existing hot air system would be discontinued and the duct work presently in existence would be either sealed or removed. Also, an industrial type vacuum system would be used on the interior of the house in order to collect any mycotoxins and mold spores which may be in the environment or which may have collected on personal property. During the removal procedure, all windows and doors would be properly sealed with all of the work being done by duly qualified environmental technicians. Also, after completion of the process, the environment would be tested by an environmental hygienist. Periodic monitoring would occur on an annual basis for two years and then on lesser periods thereafter.
In the case at bar there have been no efforts at remediation and the premises have essentially been under lock and key since approximately January of 1999.
RULINGS OF LAW
Plaintiffs rely heavily upon the case of Hanover New England Insurance Co. v. Smith, 35 Mass.App.Ct. 417 (1993), again asserting that their claim is not excluded in either the Norfolk policy or the Travelers policy. It is clear that under each policy plaintiffs’ claim must originate from a covered event or “occurrence.” It is clear that under both policies the sudden failure of the water heater at the Wycoff premises would be a covered event. The more difficult problem facing the plaintiffs is that the Norfolk policy provides in part, “We do not insure, however for loss . . . (from) any of the following: smog, rust or other corrosion, mold, wet or dry rot.” The Travelers policy provides, “We insure against risks of direct physical loss to property described in coverage A and B except: smog, rust or other corrosion, mold, fungus, wet or dry rot.”
The plaintiffs correctly argue that there is a difference between an excluded event which causes a loss and a covered event which causes a loss in the form of an excluded event in which case a “chain of events” test applies and the insurer is held liable for loss produced by an excluded clause if it was in turn produced by a covered clause. Hanover New England v. Smith, id. at pg. 421, citing Bettigole v. American Employers Ins. Co., 30 Mass.App.Ct. 272, 276 (1991). See also Jussim v. Massachusetts Bay Ins. Co., 415 Mass. 24, 27-30 (1993).
*649 This court finds that the evidence establishes that it is more probable than not that the water tank failure occurring at the Wycoff home in April of 1995, while being an insured risk, was not the proximate cause of the generation of the mycotoxins which allegedly formed the basis for the plaintiffs’ claims. The court finds that it is more likely than not that the presence of the mycotoxins within the duct work of the Liska home were generated by other sources of moisture as hereinbefore previously indicated. In summary, the court concludes that the water heater failure occurring in April of 1995, although an insured risk, was not the active efficient cause which set in motion the chain of events resulting in the loss claimed by the plaintiffs. See Jussim v. Massachusetts Bay Ins. Co., id. pg. 27, citing Lynn Gas & Elec. Co. v. Meriden Ins. Co., 158 Mass. 570, 575 (1893).
The defendants assert other defenses to plaintiffs’ claims including breach of various conditions of the policy relating to notice and the proper filing of their claim. In light of the court’s finding that an insured loss did not create a chain of events leading to the loss claimed by the plaintiffs, it is unnecessary to address the defendants’ arguments.
ORDER
For the foregoing reasons it is ORDERED that judgment enter as follows:
Upon plaintiffs’ complaint for declaratory judgment, the court ORDERS that judgment shall enter that the losses claimed by the plaintiffs under the insurance policies in question are not the result of a covered risk under the subject policy. The court concludes that such losses are a result of one or more excluded events or causes. Judgment shall therefore enter that the denial of coverage by the defendants, Travelers Property and Casualty Corp. and the Norfolk and Dedham Group, was proper under the circumstances.

There was evidence that mold thrives with certain substrates or nutrients such as plaster or wood and over time can cause excessive damage such as dry rot.